IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

Robin Mire,                          §
                                     §
          Plaintiff,                 §
                                     §
VS.                                  §     C.A. NO. H-06-0612
                                     §
Texas Plumbing Supply Co., Inc.,     §
                                     §
          Defendant.                 §

## OPINION AND ORDER GRANTING OF SUMMARY JUDGMENT

Pending before the Court in the above referenced cause, alleging co-worker sexual harassment in a hostile work environment and retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, and of the Texas Commission on Human Rights Act, Texas Labor Code §§ 21.051 and 21.055,[1] is Defendant Texas Plumbing Supply Company, Inc.'s ("TPS's") motion for summary judgment (instrument #12).

_____

[1] When the TCHRA was recodified into the Texas Labor Code and the Government Code in 1993, the short title (TCHRA) was omitted. *See Little v. Texas Dep't of Criminal Justice*, 148 S.W.3d 374, 377 (Tex. 2004). Moreover in 2003, effective March 1, 2004, the Commission on Human Rights was abolished and its duties transferred to the new Civil Rights Division of the Texas Workforce Commission. *Id*. Some courts still call it the TCHRA while others revert to chapter 21 of the Labor Code. *See, e.g.*, *Del Mar College District v. Vela*, 218 S.W.3d 856, 858 n.1 (Tex. App.–Corpus Christi 2007).

-1-

After reviewing the record, this Court concludes that summary judgment as a matter of law should be granted to Defendant, but not for the reasons argued by TPS.  Instead the Court concludes that Plaintiff fails to state and prove claims of severe and pervasive sexual harassment in a hostile work environment and of retaliation.

**Standard of Review under Rule 56(c)**

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R, Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Initially the summary judgment movant, if it is the party that does not bear the burden of proof at trial, bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact for trial; the movant may, but is not required to, negate elements of the nonmovant's case to prevail on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets this burden, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323. "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id., quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713. Conclusory statements are not competent evidence to defeat summary judgment. *Turner*, 476 F.3d at

346-479 (plaintiff "must offer specific evidence refuting the factual allegations underlying [defendant's] reasons for her termination), *citing Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.[2] The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

## Applicable Substantive Law

## Title VII

**Sexual Harassment and Hostile Work Environment**

Section 703(a) of Title VII prohibits employment discrimination against "any individual" based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2408 (2006). For an actionable claim of sexual

---

[2] The court has no obligation to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). Rather the nonmovant must identify evidence in the record and demonstrate how it supports his claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

harassment by a co-employee (not a supervisor) in the workplace, a plaintiff must show (1) that she belongs to a class protected under the statute; (2) that she was subjected to unwelcome harassment based on sex; (3) that the harassment was based on sex; (4) that the harassment affected a "term, condition or privilege of employment"; and 5) that the employer either knew or should have known of the harassment and failed to take prompt remedial action. *DeAngelis v. El Paso Municipal Police Officers Assoc.*, 51 F.3d 591, 593 (5th Cir. 1995), *cert. denied*, 516 U.S. 974 (1995); *Septimus v. University of Houston*, 399 F.3d 601, 611 (5th Cir. 2005); *EEOC v. WC&M Enterprises, Inc.*, ___ F.3d ___, 2007 WL 2285320, *4 (5th Cir. Aug. 10, 2007).   The conduct must be both subjectively and objectively offensive.  *Harris v. Forklift Systems, Inc,*, 510 U.S. 17, 21-22 (1993); *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *EEOC v. WC&M Enterprises, Inc.*, ____ F.3d ____, 2007 WL 2285320 at *4 ("Thus not only must the victim perceive the environment as hostile, the conduct must also be such that a reasonable person would find it to be hostile or abusive.").  As opined by the Fifth Circuit,

> A hostile work environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace.  Any lesser standard of liability, couched in terms of conduct that sporadically wounds or offends but does not hinder a female employee's performance, would not serve the goal of equality.

*DeAngelis*, 51 F.3d at 593. Thus the court measures Plaintiff's claim by the criteria for a hostile work environment: "(1) Sexually discriminatory intimidation, ridicule and insults, which are (2) sufficiently severe or pervasive that they (3) alter the conditions of employment and (4) create an abusive working environment." *Id*. at 594, *citing Harris v. Forklift*, 510 U.S. at 21.

"[S]exually discriminatory verbal intimidation, ridicule and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII. *DeAngelis*, 51 F.3d at 593, *citing Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 22 (1993), and *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65 (1986). Nevertheless, as the United States Supreme Court noted,

> As we pointed out in *Meritor*, "mere utterance of an epithet which engenders offensive feelings in a [*sic*] employee," *ibid.* (internal quotation marks omitted) does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or persuasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris*, 510 U.S. at 21-22. "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount

to discriminatory charges' that can survive summary judgment." *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 348 (5th Cir. 2007), *quoting Hockman v. Westward Communications, LLC*, 407 F.3d 317, 328 (5th Cir. 2004).

To determine whether an environment is "hostile" or "abusive," courts apply a totality-of-the-circumstances test, considering such factors as the frequency of the harassing conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance.[3] *Id.; Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005); *EEOC v. WC&M Enterprises, Inc.*, ___ F.3d ___, 2007 WL 2285320, *4 ("No single factor is determinative." While psychological harm is a factor to be taken into account, it is not necessarily determinative. *Harris v. Forklift*, 510 U.S. at 23, 24. Nor is the fact that an employee's work performance suffered, alone, dispositive. *EEOC v. WC&M Enterprises, Inc.*, ___ F.3d ___, 2007 WL 2285320, *4. The Supreme Court noted that "even without regard to . . . tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender,

---

[3] The list is "nonexhaustive." *Harris v. Forklift*, 510 U.S. at 24.

religion, or national origin offends Title VII's broad rule of workplace equality.'" *EEOC v. WC&M Enterprises, Inc.*, ___ F.3d ___, 2007 WL 2285320, *4, *quoting Harris v. Forklift*, 510 U.S. at 22.    Many remarks that might be considered insensitive, boorish, rude, uncouth or offensive do not rise to the level of sexual harassment.  Occasional or incidental gender-based comments, lack of courtesy, rudeness, or isolated incidents, unless extremely offensive, do not constitute discriminatory changes in the terms and conditions of an employee's employment.   *Pfeil v. Intecom Telecommunications*, 90 F. Supp.2d 742, 748, 749 (N.D. Tex. 2000), *citing inter alia Faragher*, 524 U.S. 787-88, and *Butler v. Ysleta Independent School Dist.*, 161 F.3d 263, 269 (5th Cir. 1998).  "For Title VII to step in, the Plaintiff must do more than conclusorily allege that men made dirty jokes about women, did not like working with her, and that her uniforms did not fit."  *Young v. Houston Lighting & Power Co.*, 11 F. Supp.2d 921, 933 (S.D. Tex. 1998).  The court's focus should be on whether the challenged harassment interfered with the victim's job competence, discouraged her from remaining in her job, or prevented her from advancing her career.  *Pfeil*, 90 F. Supp.2d at 749, *citing Harris v. Forklift*, 510, U.S. at 22, and *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 874 (5th Cir. 1999), *cert. denied*, 528 U.S. 963 (1999).

Under the statute an employer may be liable for harassment of an employee by other employees only if the employer

"knew or should have known of the harassment in question and failed to take prompt remedial action." *Williamson v. City of Houston*, 148 F.3d 462, 464 (5th Cir. 1998); *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999). "Generally the negligence standard governs employer liability for *co-worker* harassment." *Sharp*, 164 F.3d at 929; *Coleman v. Bd. of Richland Parish*, 418 F.3d 511, 521 n.43 (5th Cir. 2005). Where the harasser is a co-worker, the employer is only liable for the harassment when the employer has been negligent in discovering or remedying the harassment.

"[T]he type and extent of notice necessary to impose liability on an employer under Title VII are the subject of some uncertainty." *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 807 (5th Cir. 1996), *citing Waltman v. International Paper Co.*, 875 F.2d 468, 478 (5th Cir. 1989). Adequacy of notice to the employer may focus on conversations with upper management or human resource directors about alleged misconduct, and the extent and particularity of the harassment revealed by the plaintiff to such people. A company policy or handbook may be relevant to the determination. *See, e.g., Farpella-Crosby*, 97 F.3d at 807 ("Both of the human resource directors testified that under the company's sexual harassment policy, a report of sexual harassment to a human resources director would constitute notice to Horizon."). "Another factor relevant to whether [the employer] knew or should have known of [the harassing conduct] is whether the conduct took place in

public, under the eye of co-workers or supervisors." *Id.* at 807
n.5, *citing Nash v. Electrospace, Sys., Inc.*, 9 F.3d 401, 404 (5th
Cir. 1993).

Once an employer receives notice of harassing conduct, he
has a duty to take prompt corrective action "reasonably calculated"
to end the harassment. *Skidmore v. Precision Printing and
Packaging, Inc.*, 188 F.3d 606 (5th Cir. 1999); *Parkins v. Civil
Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)("An
employer's legal duty in co-employee harassment cases will be
discharged if it takes 'reasonable steps to discover and rectify
acts of sexual harassment of its employees.'"). In *Skidmore*, 188
F.3d at 615-16, the Fifth Circuit opined,

> "What is appropriate remedial action will
> necessarily depend on the particular facts of
> the case--the severity and persistence of the
> harassment, and the effectiveness of any
> initial remedial steps. . . . [N]ot every
> response by an employer will be sufficient to
> discharge its legal duty. Rather, the
> employer may be liable despite having taken
> remedial steps if the plaintiff can establish
> that the employer's response was not
> 'reasonably calculated' to halt the
> harassment."

*Id., quoting Waltman v. International Paper Co.*, 875 F.2d 468, 479
(5th Cir. 1989). The plaintiff bears the burden of demonstrating
that the employer failed to take effective action. *Id.* In *Sharp*,
164 F.3d at 929, the Fifth Circuit concluded that an employer has
actual knowledge of harassment when it is known by "higher
management." An employee is part of "higher management" when he

has "the power not only to hire and fire the offending employee but also to take disciplinary action, to provide significant input into employment decisions, to instruct the offending employee to cease the harassing behavior, or to implement other means of taking remedial action." In the past the Fifth Circuit often concluded as a matter of law that an employer's conduct satisfied the prompt remedial action standard. *Skidmore*, 188 F.3d at 616, *citing Hirras v. National Railroad Corp.*, 95 F.3d 396, 400 (5th Cir. 1996)(listing cases). One reason was that the harassing conduct ceased. *Id.*, *citing Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999); *Waymire v. Harris County*, 86 F.3d 424, 429 (5th Cir. 1996). *Id.* *See also Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 309-10 (5th Cir. 1987)(reversing judgment for the plaintiff where the employer took decisive action but the plaintiff quit her job too soon for the remedy to have effect.).

As the Fifth Circuit has recently observed with regard to the statute of limitations in hostile work environment claims,

> An individual claiming discrimination in the violation of Title VII must file a charge of discrimination within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). The filing of a timely EEOC charge is a statutory prerequisite to filing suit. . . . Because a hostile work environment generally consists of multiple acts over a period of time, the requisite EEOC charge must be filed within 300 days of any action that contributed to the hostile work environment. . . . If that requirement is met, the court may consider all of the acts that are alleged to have

-11-

> contributed to the hostile work environment
> even though some of them may have taken place
> outside of the 300-day filing period.
> [citations omitted]

*EEOC v. WC&M Enterprises, Inc.*, ___ F.3d ___, 2007 WL 2285320 at
*2.

## Retaliation

Title VII's anti-retaliation provision bars an employer
from "discriminat[ing] against" an employee or job applicant on the
grounds that the individual "opposed any practice" made unlawful by
Title VII or "made a charge, testified, assisted, or participated
in" a Title VII proceeding or investigation. Section 704(a) of
Title VII, 42 U.S.C. § 2000e-3(a). The United States Supreme Court
recently held that the provision "does not confine the actions and
harms it forbids to those that are related to employment or occur
at the workplace." *Burlington Northern*, 126 S. Ct. at 2409, 2412-
13. It further concluded that the statute covers only "employer
actions that would have been materially adverse to a reasonable
employee or job applicant," i.e., "the employer's actions must be
harmful to the point that they could well dissuade a reasonable
worker from making or supporting a charge of discrimination." *Id.*
at 2409.[4]   The function of the objective standard that a

_____

[4] The Supreme Court's newly articulated standard abrogated the
Fifth Circuit's previous, narrower "ultimate employment decision"
standard, which limited "'actionable retaliatory conduct to such
acts as hiring, granting leave, discharging, promoting, and
compensating.'" *Burlington Northern*, 126 U.S. at 2410, *citing
Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997),

-12-

reasonable employee must find the challenged action to be "materially adverse" is to "separate significant from trivial harms" because Title VII "does not set forth a general civility code for the American workplace"; abusive language, personality conflicts in the workplace that generate antipathy, snubbing by supervisors and coworkers, gender-related jokes are not actionable under the anti-retaliation provision. *Burlington Northern*, 126 S. Ct. at 2415.[5]  The "materially adverse" standard does not require the factfinder to consider the nature of the underlying

_____

*cert. denied*, 522 U.S. 932 (1997); *McCoy v. City of Shreveport*, _ F.3d ___, No. 06-30453, 2007 WL 1991042, **4-5 (5th Cir. July 11, 2007).

   [5] *See also Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998):

> Title VII does not prohibit all verbal or physical harassment in the work place; it is directed only at "*discriminat[ion]* . . . because of . . . sex." We have never held that workplace harassment is automatically discrimination because of sex merely because the words used have sexual content or connotations.  "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  . . . [Title VII] forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment.  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview. . . . We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace-such as male-on-male horseplay or intersexual flirtation-for discriminatory "conditions of employment."

-13-

discrimination that led to the filing of a charge, but instead is tied only to the challenged retaliatory act. *Burlington Northern*, 126 S. Ct. at 2416 ("By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination.").

A plaintiff may prove a claim of retaliation by direct or circumstantial evidence. *McCoy v. City of Shreveport*, ___ F.3d _ , No. 06-30453, 2007 WL 1991042, *2 (5th Cir. July 11, 2007). If by the latter method, the usual way, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), applies. *Id.*

The plaintiff must initially establish a *prima facie* case of retaliation by demonstrating that (1) she engaged in an activity that Title VII protects; (2) [the defendant employer] took an adverse employment action; and (3) a causal nexus exists between her protected activity and the adverse employment action. *Id.*; *Harvill*, 433 F.3d at 439, *citing Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 167 (5th Cir. 1999). Under Title VII, an employee has engaged in protected activity if she has 'opposed any practice made an unlawful employment practice under [41 U.S.C. § 2000e-3(a)]." *Turner*, 476 F.3d at 348. To meet this

requirement, the plaintiff "need only show that she had a 'reasonable belief that the employer was engaged in unlawful employment practices.'" *Id., citing Byers v. Dallas Morning News*, 209 F.3d 419, 428 (5th Cir. 2000).

If she does, the burden shifts to the defendant employer to proffer a legitimate, nondiscriminatory reason for the adverse employment action taken against her. *McCoy*, 2007 WL 1991042 at 2. The employer has only the burden of production; the burden of persuasion remains with the plaintiff throughout. *Id.*

If the employer succeeds, the burden shifts back to plaintiff, who must then bear the ultimate burden of proving that the employer's articulated legitimate reason is not true, but is merely a pretext concealing the real retaliatory purpose for the adverse employment action. *Id.* The Fifth Circuit has long held that the appropriate standard of proof is that the adverse employment action would not have occurred "but for" the plaintiff's protected activity. *Strong v. University Healthcare System, LLC*, 482 F.3d 802, 806 (5th Cir. 2007), *citing Septimus*, 399 F.3d 608.

The proximity in time between the employee's protected activity and an adverse action against him may satisfy the "causal connection" required for a *prima facie* case of retaliation. *Id.* at *7. Nevertheless, after "'the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the

-15-

jury may infer that retaliation was the real motive.'"   *Id.,*
*quoting Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir.
1997).

## TCHRA

Because the TCHRA was "modeled after federal law with the
purpose of executing the policies in Title VII of the federal Civil
Rights Act of 1964, "analogous provisions" of the two statutes and
case law interpreting them guide Texas courts in construing the
TCHRA. *Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 445-
46 (Tex. 2004); *Dias v. Goodman Manufacturing Co.*, 214 S.W.3d 672,
677 (Tex. App.–Houston [14[th] Dist. 2007), *citing Quantum Chem. Corp.
v. Toennies*, 47 S.W.3d 573, 476 (Tex. 2001). *See also Shackelford
v. Deloitte & Touche, L.L.P.*, 190 F.3d 388, 404 n.2 (5th Cir.
1999)(Because "the law governing claims under the TCHRA and Title
VII is identical," courts construe them the same way.).  Sexual
harassment and retaliation provisions are such analogues.

A.  Sexual Harassment

Section 21.051 makes it unlawful for an employer to
discriminate with respect to compensation or the terms, conditions
or privileges of employment on the basis of, *inter alia*, sex.
Sexual harassment is a type of sex discrimination prohibited by the
Texas Labor Code. *Syndex Corp. v. Dean*, 820 S.W.2d 869, 871 (Tex.
App.–Austin 1991, writ denied), *citing Meritor Savings Bank, FSB v.
Vinson*, 477 U.S. 57, 65 (1986).   Because Texas courts follow

-16-

federal precedent where provisions under the Labor Code are analogous to those under Title VII, the result will be the same for claims of hostile work environment under both statutes. *Del Mar College District*, 218 S.W.3d at 861 n.4; *AAA Office Coffee Service, Inc. v. Hansen*, No. 01-03-00984-CV, 2005 WL 2470666, &6 (Tex. App.–Houston [1st Dist.] Oct. 6, 2005).

B. Retaliation

Section 21.055 of the Texas Labor Code provides in relevant part,

> An employer . . . commits an unlawful employment practice if the employer, labor union, or employment agency retaliates or discriminates against a person who, under this chapter,
>
> (1) opposes a discriminatory practice;
>
> (2) makes or files a charge;
>
> (3) files a complaint; or
>
> (4) testifies, assists, or participates in any manner in an investigation, proceeding or hearing.

Retaliation claims under § 21.055 of the Texas Labor Code are also construed in accordance with federal precedent for such claims under Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a). Thus here the result will be the same under both statutes.

### Plaintiff's Factual Allegations

The following allegations are a combination of statements made in Plaintiff Robin Mire's bare-bones complaint and in her

-17-

response to the motion for summary judgment.  Plaintiff asserts
that she was hired by TPS, a small, family-owned business that
sells plumbing supplies to plumbing contractors and plumbers, in
January, 2000.  She was trained by Margaret Anthony ("Anthony"),
who became her supervisor, to work as an accounts payable clerk.
Plaintiff states that throughout her five years' employment at TPS
she maintained an excellent work record, that there were no
complaints about her skills or ability to handle her job, that she
received a bonus of almost $4,000, almost 17% of her base pay,
based in part upon her job performance, on December 17, 2004, about
six weeks before she was terminated, and that she was given an
approximately 10% pay raise in June, 2004.

        Plaintiff, a married woman, alleges that about four
months before she was terminated, a rumor circulated that she was
having an affair with a co-worker.[6]  She claims that subsequently
she was subjected to increased sexual harassment by Defendant's
male employees.[7]  Specifically she states that Sonny Ackley

---

[6] That coworker is identified by Defendant as Don Pearson.

[7] Plaintiff's EEOC Charge of Discrimination (Ex. D), filed on July
25, 2005, states that the harassment occurred between December 2004
and February 4, 2005.  Specifically as the "particulars" of her
charge:

    I was employed as Accounts Payable until I was discharged
    on February 4, 2005.  My supervisor was Ms. Margaret
    Anthoney and no other individual was employed as an
    accounts payable rep.  On or about December 2004, a
    female employee started rumors about me having an affair
    with another employee.  Immediately, the male employees

("Ackley") "grabbed [her] butt"; that Ricky Garza ("Garza") constantly commented about "how good [her] butt looked" and also asked if "she had had a boob job and requested to touch them"; Fidel frequently whistled and once grabbed her in a dance pose and starting dancing in front of her supervisor; Johnny Booth ("Booth") regularly commented, "I hate to see you leave, but love to see you walk away"; while Kenny Tillmon ("Tillmon") commented multiple times about the "junk in [her] trunk," i.e., her butt, she explains.

Plaintiff claims that she complained to her supervisor, Anthony, about Ackley.  She claims that Ackley responded "that the company did not need Mr. Ackley anymore because he was a drunk and that the company should have forced him to retire a long time ago,

---

started to make sexual/derogatory comments.  Such comments included how good my "ass looked in jeans", and comments included me having a "boob job".  Around or about January 2005, I complained to Human Resource Director Mr. Ethan Flowers about the sexual harassment.  After the meeting a salesman called me on the phone and told me that if I wanted to give "it" to another male employee I could because, "I'm an old man and I can still get it up".  The next day, February 2, 2005, I reported the comment to Mr. Flowers, and on February 4, 2005, I was discharged from the company.

Mr. Flowers stated that my work performance declined after the February 1, 2005 meeting.

I believe I was discriminated against, because of my sex (female) and retaliated against for reporting the sexual harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended.

but that the owner would never do that to Mr. Ackley."[8]  Plaintiff reported Garza's conduct to her supervisor the same day and was told that "Garza was perverted and was always on the computer with sex."  Furthermore, she claims that her supervisor confirmed that the supervisor saw Fidel "grab her and dance."  She also claims that she reported Booth's comment, made in November or early December 2004, to her supervisor.[9]

Plaintiff states that when she told her supervisor about these sexual comments, the supervisor told her that she should not be standing at the counter and should go outside to smoke. Plaintiff claims that she also complained to Human Resources Director Ethan Flowers ("Flowers"), the manager over her supervisor (Anthony), and that she was terminated one week later.  She also claims that she, personally, had told one of TPS's owners, Terry Snyder ("Snyder"), that "she wanted all the 'bullshit' to stop." Snyder told Plaintiff that "everything would cool down after a little while.  They would go on to something else."

---

[8] During her deposition (Ex. 1 to #15 at 91), Plaintiff testified that Debby Renfro also complained about Sonny's sexual harassment and that it was in response to Renfro's complaint that Margaret said Sonny was a drunk. On its face, this testimony is inadmissible hearsay.

[9] Plaintiff is somewhat hazy about the dates of these comments and contradictory about whether some them were made repeatedly or just once.  In her motion she states that the comments from Garza and Taylor and the grabbing and dancing by Fidel occurred in December 2004.  "[O]ther comments were made on a daily basis."

The complaint vaguely asserts, "Plaintiff's work environment became so hostile and stressful that Plaintiff was losing weight and not sleeping well.  Following her wrongful termination due to retaliation, she continued to have medical problems due to the stress and anguish from the situation created by Defendant."  Her description is vague and she offers no evidence in support of her claims of medical ills.  Plaintiff asserts that in late 2004, the environment became so hostile and the "sexual comments were so prevalent" that she was reduced to tears, everyone's work was impacted, and rumors had spread outside to her husband's workplace.  She conclusorily states that "employees came to accept comments like 'That's what I like to see, a woman on her knees' from the owner."  Plaintiff also claims that other female workers complained to Plaintiff's supervisor of sexual harassment by Ackley, but the supervisor "waived it off" on the grounds that Ackley was a drunk.  Moreover remarks were made about Plaintiff's "lover" and she was subjected to requests for sexual intercourse."  Either at or after an employee meeting in February, at which Human Resources Director Flowers discussed rumors charged by Plaintiff and admonished the employees that anyone involved in them would be punished, up to and including termination, one employee commented, "If you want to give it up to somebody, give it to [me].  I'm still

an old man and I can still get it up."[10]   Finally Plaintiff complained to her supervisor, Anthony, and to Flowers on February 12, 2005 about the Sonny Ackley's phone call.  She was terminated two days later, without being given anything in writing, but was told "things aren't working out."  She was also asked not to sign off on any termination papers.  Because she was asked if she had a tape recorder, she thought she was being fired because of a tape recorder.  She was also told that she was not doing her job, but she maintains that her work was up to date and that Flowers could not identify anything that had not been completed.  Thus she does not claim that her work was affected by the alleged harassment.

Plaintiff charges that TPS "wholly failed to conduct an investigation into the numerous complaints of sexual harassment" that she made to Anthony.  She also maintains that she was instructed not to complain to the owner but to take any complaints to her supervisor, as she did, thus placing her employer on notice of her sexual harassment complaint.  Anthony informed Plaintiff that Snyder and Flowers were told of her complaints.

Moreover, she contends that TPS retaliated against her for complaining about the sexual harassment to her supervisor, to Flowers, and to Snyder.

---

[10] In her EEOC Charge of Discrimination ( Ex. D to #12), Plaintiff states that a male employee, apparently Ackley, called her after the meeting on February 1, 2005, and made the comment.  After she told Flowers about it on February 2, 2005, she was discharged on February 4, 2005.

Plaintiff's only evidence consists of her own deposition testimony and affidavit.  Ex. 1 and 2 to #15.

### TPS's Motion for Summary Judgment

Supported by documentary evidence, TPS argues that employees deposed maintained that they did not make any sexual comments toward Plaintiff and did not make any sexual advances, nor did they see or hear any other employee do so nor were aware of such conduct by others:  Garza (Ex. F at 12); Booth (Ex. G at 7-8); Pearson (Ex. I at 5-8); Tillmon (EX. • at 6, 17); Charles Larson (Ex. K at 9, 6); Pat Palacios (Ex. L at 9, 6).  TPS also maintains that while Plaintiff Mire did complain to Flowers about the rumor that she was engaged in a extramarital affair,[11] Plaintiff did not complain about the alleged sexual harassment to either Flowers[12] or Snyder.  Flowers responded to her complaint by discussing the issue of rumors at the monthly employee meeting on the first Tuesday in January, 2005.[13]  Flowers' Dep. (Ex. C at 7).

_____

[11] In his deposition (Ex. C at 6-7), Flowers stated that he first heard the rumor of the affair in early 2004, but that nobody discussed it much, that since he felt it did not affect work performance, he did not discuss it with Plaintiff or Pearson.  Only toward the end of year did the "rumor get hot and heavy," and Plaintiff "began to complain to me immensely, . . . specifically around Thanksgiving time."

[12] See, e.g., Flowers' Deposition (Ex. C at 1112).

[13] At that meeting, Flowers testified, "We did not discuss that particular rumor because I didn't feel it was appropriate to bring that rumor up, but it was made abundantly clear to everyone in the company that rumors of that sort was no one's business and it was

-23-

Flowers made the decision to terminate Plaintiff in February, 2005, based on work performance because Plaintiff was creating a hostile work environment:  she continually threatened to quit because of problems with Anthony,[14] stated that she was completely unhappy with her work, did not like her work, and did not like anyone at work.  Flowers' Dep. (Ex. C at 14-5).  The document evidencing her Exit Interview states that Flowers terminated her because of her "combative personality, continual dishonesty, and lack of job performance."  Ex. N.  In a Declaration (Ex. A) Flowers stated that Plaintiff took so many smoking breaks that he had to institute a policy of limiting breaks to two fifteen-minute breaks a day, one in the morning and one in the afternoon.  Plaintiff admitted during her deposition (at 93-94) that she took between five to ten smoking breaks per day.

_____

not a policy of the company to find out whether the rumors were true, but that we would not allow it to affect the job performance of our employees . . . . "  *Id.* at 8.  Flowers further testified that a week or so after the meeting, Plaintiff told him that things had gotten a lot better.

[14] Flowers testified at length, Ex. C at 16-23, about Plaintiff's combative relationship throughout 2004 with Anthony, about complaints made by other employees about Plaintiff, and about his own problems with her combative attitude.  As for poor job performance, Flowers identified Plaintiff's inability to reconcile the accounts payables and the checkbook (*id.* at 25-25), objection to and failure to do filing (*id.* at 26-7), incorrect numbers on her daily totals (*id.* at 27-28, Anthony's complaints that Plaintiff took off from work too much (*id.* at 31-32) and that Anthony felt that Plaintiff was physically threatening her and improperly bothering her at home (*id.* at 35-36).

Snyder also testified about Plaintiff's combative nature and stated that he had witnessed her yelling at people, slamming doors, threatening people, cursing, storming out, moving "from crisis to crisis." Ex. B at 19-20.

Regarding the hostile working environment claim, TPS contends that she failed to establish (1) the second element of her *prima facie* case, i.e., that she was subject to unwelcome sexual harassment, as evidenced by the deposition testimony of her co-workers; (2) the third element, that the harassment was based on sex because there is no evidence that Plaintiff was harassed in any way, no less sexually; (3) the fourth element, i.e., that the harassment affected a term, condition or privilege of her employment, because Plaintiff has not produced any evidence demonstrating that the work environment was abusive (frequency of discriminatory conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance; or whether in unreasonably interfered with her work performance); and (4) the fifth element, that TPS knew or should have known of the harassment and failed to take remedial action because, according to

the deposition testimony of Flowers and Snyder,[15] Plaintiff never

reported any sexual harassment to either of them.[16]

   With respect to the retaliation claim, TPS maintains that

Plaintiff cannot satisfy the first element of her *prima facie* case,

i.e., that she engaged in a protected activity, because Plaintiff

did not report the alleged sexual harassment to Flowers or Snyder.

---

[15] TPS disregards the fact that Snyder in his deposition (Ex. B
at 8) testified that TPS did not have an employee handbook.
Plaintiff in her affidavit (Ex. 2 to #15) stated, "Texas Plumbing
Supply did not have a handbook or any specific procedures for
filing complaints about Sexual Harassment.  I was told to take any
complaint I had to my supervisor Margaret Anthony and not to take
any complaints to the owner."  The informality of the business
structure at TPS is further obvious from Flower's admission of the
lack of written records relating to employee problems and
counseling, not to mention "Human Resources Director" Flowers'
description of his job:  "I am manager, as well as a slash
salesman, slash counter guy, slash driver, slash whatever it
takes."  Ex. C to #12 at 5.  Moreover Flowers' deposition testimony
makes it clear that he and Anthony conferred frequently about
Plaintiff and her rocky relationship with and complaints to
Anthony.

[16] Defendant argues that the alleged comments could not have been
threatening or humiliating nor could they have unreasonably
interfered with her work performance because Plaintiff testified
that they only occurred when she was downstairs at the counter
smoking, not when she was working.  Plaintiff's Dep. (Ex. E at 83,
85, 86, 153, and 154.  Moreover if they were threatening or
humiliating, she could simply have gone outside to smoke.
   These arguments are meritless.  The smoking area at the
counter or just outside was part of the workplace (*see, e.g.*,
Flowers' Declaration, Ex. A), Plaintiff frequently was required to
go there to hand in invoices there, other employees worked there,
and anything harassing said or done there by fellow workers might
easily continue to affect the work performance of a plaintiff when
she returned to her desk upstairs.  An abusive work environment is
not limited to the location of an employee's desk or the moment
when an offensive comment is made.  Nor does the law require a
victim of a hostile work environment to leave the work place to
avoid abuse.

Nor can she establish the third element, i.e., that she was discharged for engaging in a protected activity because Flowers testified that he fired her because of her work performance and because of the reasons listed on the Exit Interview form.  Snyder testified that he and Flowers had discussed Plaintiff's poor work performance and combative nature before the time she alleges she reported the sexual harassment to Flowers.  Snyder Dep. (Ex. B at 7, 10).  Plaintiff has not produced any objective, credible evidence to support her retaliation claim, insists TPS.

For the same reasons, maintains TPS, Plaintiff has failed to plead a claim for sexual harassment and retaliation under the TCHRA.

### Court's Determination

With regard to the summary judgment evidence, this Court notes that TPS ignores Plaintiff's deposition testimony, which contradicts its own, and does not challenge the admissibility of Plaintiff's deposition testimony.  This Court cannot make credibility determinations nor weigh the evidence on summary judgment.  *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007).  The fact that none of the employees testified in support of Plaintiff's claim is not dispositive in a hostile work environment claim.

Defendant does object to Plaintiff's affidavit (attached to her Response (#15) as Ex. 2) as being conclusory and therefore

insufficient to raise fact issues. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990)("The object of [FRCP 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Ryland Group v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996). TPS further argues that assertions of subjective beliefs do not constitute competent summary judgment evidence and must be disregarded. *Texas Division-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994). Specifically TPS objects to Plaintiff's statement in the affidavit about the $4000 bonus in December 17, 2004 and 10% pay raise in June 2004: "It was my understanding that I received the increase in pay and bonus for doing a good job."

        This Court observes that Plaintiff was testifying from personal knowledge that she "never received any reprimands or write-ups[,] . . . any complaints about mistakes or ability to handle my job" and that she did receive the $4000 bonus and a pay raise in 2004. TRS has not argued, no less demonstrated, that she did not receive the bonus or the pay raise. The Court agrees that the statement singled out by TPS, that she viewed the bonus and pay raise as a reward for doing a good job, is subjective and conclusory and not admissible.[17]

-----

[17] Moreover, the weight given to the bonus is minimal. Snyder, who approved bonuses at TPS, testified that bonuses were given "for working," and that he always gave everyone a bonus. "It's more so that if the company does well, and that's what I tell the employees, if the company does well, then there'll be money that I

As noted earlier, "[c]onduct that is not severe or persuasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris*, 510 U.S. at 21-22.  "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory charges' that can survive summary judgment." *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 348 (5th Cir. 2007), *quoting Hockman v. Westward Communications, LLC*, 407 F.3d 317, 328 (5th Cir. 2004).

The Fifth Circuit has rejected, as insufficiently offensive to constitute a hostile or abusive work place, claims, though sexual in nature, that were far more offensive, pervasive, and severe than those alleged by Plaintiff.  For example, the allegations of the following conduct in *Shepherd*, 168 F.3d at 872, was rejected by the appellate court as insufficient to establish an abusive work environment:

---

try to split up at the end of the year for all of the employees, and the bonuses are graded on what their base salary is and then plus their performance."  Ex. B at 21-22.  He testified the same about pay raises.  *Id.* at 23.  Plaintiff has not rebutted this testimony with any evidence about specific facts about her own or other employees' situations.

According to Shepherd's deposition, on one occasion Moore stood in front of Shepherd's desk and remarked 'your elbows are the same color as your nipples.' Shepherd testified that Moore remarked once 'you have big thighs' while he simulated looking under her dress. Shepherd claimed Moore stood over her desk on several occasions and attempted to look down her clothing. According to Shepherd, Moore touched her arm on several occasions, rubbing one of his hands from her shoulder down to her wrist while standing beside her. Shepherd alleged additionally that on two occasions, when Shepherd looked for a seat after coming in late to an office meeting, Moore patted his lap and remarked 'here's your seat.'

In contrast, in *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803 (5th Cir. 1996), the Fifth Circuit found the plaintiff stated and proved with substantial evidence at trial a claim of hostile work environment sexual harassment that was pervasive and severe. The plaintiff, working as a treatment nurse in a nursing Home owned by Horizon Health Care, had alleged that the director, Jose Blanco harassed her:

Many of Farpella-Crosby's complaints stem from Blanco's frequent comments attributing Farpella-Crosby's large number of children to a proclivity to engage in sexual activity. Blanco repeatedly commented that he "knew what she liked to do" because she had seven children and that she "must not have a television." At a baby shower held at the facility for another employee, Blanco joked to the group to the group that Farpella-Crosby "doesn't know how to use condoms." Blanco frequently inquired about Farpella-Crosby's sexual activity. He would often question her and Denise Vujevic, her co-worker, about where they had been the night before (while off duty) whether they had taken men home, and whether they "got any." Farpella-Crosby and

> Vujevic both testified that Blanco made
> similar comments two or three times a week.
> Farpella-Crosby testified that the comments
> were so frequent that she could not possibly
> remember each instance. Blanco threatened
> Frapella-Crosby with her job on numerous
> occasions when she asked him to stop making
> these comments.
>    On one occasion, after Frapella-Crosby
> had eaten lunch in her office with a
> boyfriend, Blanco said that "when you open the
> door [to the office,] the smell of fish just
> hits you in the face. You shouldn't be doing
> that kind of thing at work." Robert Martinez,
> a social worker [at the nursing home] . . .
> testified that he remembered Blanco making
> this comment and told him he should stop . . .
> .
>    Frapella-Crosby also complained of
> hostile treatment by Blanco that was not
> overtly related to her gender. Blanco often
> asked her to perform menial tasks outside of
> her job description, such as refilling his
> coffee cup, washing his dirty dishes. Blanco
> and Humberto Arriola, assistant director of
> nursing, would also make fun of her by blowing
> into her ear and pretending that they could
> feel wind come out of the other side of her
> head.

97 F.3d at 805.

The Fifth Circuit also found that the numerous and severely offensive harassing incidents over a period of years (1982-1985) alleged in *Waltman v. International Paper Co.*, 875 F.2d 470-71& nn. 1 and 2 (5th Cir. 1989) sufficiently severe and pervasive to create a fact issue as to whether the work environment in the powerhouse of the paper mill where the plaintiff worked was hostile and abusive. In that case the plaintiff, Susan Waltman, alleged that a co-worker "several times broadcast obscenities

directed toward Waltman over the public address system" resulting in other employees' making suggestive comments to plaintiff; her supervisor and his assistant urged her to have sex with a co-worker; the supervisor pinched her buttocks with pliers and tried to put his hands in her pockets; her supervisor and other employees made suggestive comments such a "I would like a piece of that"; more than thirty pornographic notes were put in her locker; sexually explicit pictures and graffiti were drawn on the walls of the powerhouse where she worked, of the restroom ("very, very explicit drawings of women with their legs spread out") and in the elevator ("Sue is a whore" was carved in the paint on the elevator in eight-inch letters); employees had sexually oriented calendars on the walls and "drawings of naked men and women" in their lockers that were left open; employees hung used tampons from their lockers; and co-workers more than once propositioned her. Plaintiff "testified that '[t]he things that were written on the walls were the same types as things that were put on the notes in lockers, in my locker, such as Sue sucks everybody's dick, Sue is a whore, I am going to eat Sue's pussy or Sue has a nice pussy, this type of thing, the same language that was in the elevator.'" *Id.* at 471 n.2.   After she reported the incidents to a manager, another employee told a truck driver that Waltman was a whore and would be injured if she did not keep quiet. *Id.* at 471.  Moreover, she was subjected to physical assaults:  an employee grabbed her arms while

-32-

she was carrying a vial of hot liquid; another stuck his tongue in her ear. *Id.* Another time a co-worker threatened that he would cut off her breast and shove it down her throat; that same employee subsequently danged her from a thirty-foot stairwell. *Id.* Another employee pinched her breasts, while another grabbed her thigh. *Id.* Moreover fellow workers, a group she estimated was eighty percent of the men in the powerhouse, constantly made lewd and suggestive comments toward her. Waltman claimed that sexual harassment caused her to become severely depressed, take sick leave for nearly three months, and required her to be hospitalized for depression for a few days; when she returned to work, the harassment continued.

Applying a totality of the circumstances review, this Court finds that, as a matter of law, for the reasons stated below, Plaintiff's factual allegations do not rise to the level of those in the above cases and are insufficient to establish under Title VII and the TCHRA a hostile and abusive work environment claim in which the alleged sexual harassment was so severe and pervasive that it unreasonably interfered with Plaintiff's work performance. A key point here is that Plaintiff insists that she completed all her work, i.e., that the alleged harassment did not interfere with her job performance. Furthermore, the Court examines *infra* the nature of each incident alleged by Plaintiff in her response to the motion for summary judgment and in her deposition to constitute sexual harassment and the context in which it occurred to

demonstrate why individually or collectively they are not sufficiently severe and pervasive as to constitute a hostile or abusive workplace.  None of the incidents pointed out by Plaintiff rise to the level necessary to establish a hostile work environment.

First of all,  Plaintiff, although she had worked for TPS for five years, claims she was subjected to the alleged harassment at most for only the last four months.  Plaintiff's EEOC charge targets only a couple of months of harassment, i.e., in December 2004 and January 2005.  The limited period of alleged harassment does not support a "severe" and "pervasive" abusive environment.

Plaintiff complains of a  general rumor at her own workplace at TPS and beyond that she was having an affair with co-employee Pearson, which was purportedly spread by a *female* employee, Debbie  Renfro (Ex. 1 at 87),[18] with Plaintiff's and many other employees' knowledge, as evidenced by their depositions, before Plaintiff suddenly became sufficiently bothered by it around Thanksgiving of 2004,[19] when she claims that she complained to Anthony.  The Court does not find that the unsubstantiated general rumor constituted sexual harassment.   "Title VII cannot remedy

---

[18] The female employee, Renfro, is not identified by Plaintiff as a harasser in either the briefing or her deposition.

[19] According to Flowers' deposition, he heard the rumor "toward the beginning of 2004," but Plaintiff did not complain until around Thanksgiving time of that year.  Ex. C at 6.

every tasteless joke or groundless rumor that confronts women in
the workplace." *DeAngelis*, 51 F.3d at 597.  Furthermore, as noted,
the challenged conduct must be both subjectively and objectively
offensive.  *Harris v. Forklift Systems, Inc,*, 510 U.S. 17, 21-22
(1993); *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).
Moreover, Flowers addressed the question of unfounded rumors in the
workplace at the first monthly employee meeting in January 2005.
Plaintiff testified at her deposition that at the January and
February employee meetings Flowers told them that the spreading
rumors would not be tolerated and that someone who did would be
terminated.  Ex. 1 to #15 at 95, 96.

        With regard to the rumor of the affair, after Pearson
quit, she complained that Ray Rhodes, from TPS' other store, called
Margaret, not Plaintiff; Margaret was not available so Plaintiff
asked if she could help him.  Rhodes told her that everyone in his
store knew about the rumor and asked "Well, how are you doing?  How
do you feel now that your lover boy walked out."  Ex. 1 at 81-82.
She complained, "It was uncalled for" and that it upset her and
that she "had tears in her eyes whenever I told Margaret and I also
told Ethan."  *Id.* at 82.  Objectively the Court finds that the
remark was not severe harassment.  Plaintiff testified that Rhodes
did not proposition her, she conceded that he did not make a
"sexual" comment to her (*id.*), and she acknowledged the single

-35-

comment in the one phone conversation was all he ever made about the matter.  *Id.*

Not only does Plaintiff fail to produce testimony from any co-employee supporting her allegations, but Plaintiff does not assert, aside from the general rumor of an affair with Pearson, that any of the challenged remarks was made in public.  The only allegations she makes that someone else was present as a witness was that one day, in an isolated incident, Fidel grabbed her in a dance pose and started dancing, and Anthony saw them, but made no comment.  Dep. at 84-85.  Her deposition testimony, setting the context of the incident, does not indicate that either she or her supervisor was severely offended by the action:

> Fidel, he would always whistle.[20]  He came upstairs one day to get lunch, whatever he was doing in the kitchen.  I had my radio on and he pulls me up to start dancing and I asked him, "What are you doing, Fidel?"
> He said, "Dance, dance, baby."  And then he started talking about me and him going to some club he went to.
> And I told him no, I didn't think so.  And then I said, "Well, is your wife going to be there?"  He said, No, just me and you baby."
> And I told him no.  "No I don't think so.  There's already too much shit going on."  Those were the exact words I told him.  And Margaret [Anthony] walked from her office right past me into the kitchen and looked right at us while that was going on and said absolutely nothing, absolutely nothing at all.  And she saw it with her on eyes.

---

[20] Plaintiff does not state that he was whistling at her, in a sexual manner.

Ex. 1 at 84.  The questioning went on:

> Q.  What did she see?
> A.  Fidel grabbing me.
> Q.  Grabbing you in a dance pose?
> A.  It a up —— yeah.
> Q.  Kind of like a spin move or something or what?
> A.  Yeah.  He grabbed me up, had his arms on me and I'm telling him, you know, "Fidel, let me go.  I have work to do."  She walked right past us and never said a damn word.

*Id.* at 85.  Such harmless workplace flirtation, confined to a single instance, is not severe and pervasive sexual harassment. Plaintiff's own testimony does not suggest she was physically threatened or intimidated or humiliated by this harmless act.

Plaintiff charges that Sonny Ackley once grabbed her behind.  Ex. 1 at 87.  She also claims that he called her before the employee meeting that Flowers held to address the rumor situation.  According to Plaintiff, Ackley called her first on the company phone just before the meeting and told her "to keep my mouth shut at the meeting and not to say anything."  Ex. 1 at 86. She stated that he further said "Let me call you back on your cell phone. . . . There's too many ears up there."  Ex. 1 at 86.  She also said, "I didn't understand what he was talking about."  *Id.* But Plaintiff modified her story and testified that when she got off from work, *she* called Sonny back on her cell phone.  *Id.* at 87-88.  Sonny told her that Renfro was spreading the rumor about Plaintiff and Pearson and that she should keep her mouth shut at the meeting.  *Id.*  She testified that he also said, "Hell, I'm an

old man and I can still get it up. . . . . If  you want to give it
to somebody, give it to me." Plaintiff claims she hung up on him.
Not only did she voluntarily make the evening call (despite her
claim that he grabbed her buttocks), although he made a dirty
comment, there is not severe sexual harassment involved here.

      Plaintiff testified that Garza made comments all the time
about "how good my butt looked." Dep. at 83, ll. 22-5.
Nevertheless her reaction indicate the comments were not severely
offensive to her (i*d*. at 83, ll.24-84, l 1.):  "At first I took it
as compliments, but it was not compliments.  I mean, the more that
was said."  She complained that Garza also asked once if she "had
a boob job, is what he asked, and asked me if he could touch them."
This allegation is more serious and certainly offensive, but she
does not claim that Garza inappropriately touched her and Plaintiff
does not allege that she was intimidated  showed no signs of stress
from the incident.  Similarly, Kenny Taylor allegedly told
Plaintiff that "the jeans that I had on made my ass look really
good."  *Id.* at 86.  Plaintiff's reaction indicates she was not
humiliated or incensed but flirted back:  "And it kind of
embarrassed me a little bit and so I said, 'Well, since you're
looking so close, I'll wear them again tomorrow for you,' because
I mean, it embarrassed me when he said it."  *Id.* The complaints
about comments by other co-workers are vague and not threatening
nor of the severity necessary to sustain an abusive work

environment claim:   Johnny Booth ("Booth") regularly commented, "I hate to see you leave, but love to see you walk away" and Kenny Tillmon ("Tillmon") commented multiple times about the "junk in [her] trunk." Her general allegation that others propositioned her for sexual intercourse is too vague, non-specific as to time, person, locations, to constitute competent summary judgment evidence.

None of the charged speakers is alleged to have had sex with Plaintiff, none physically threatened her, and none charged that she was incompetent to perform her job because of her sex. She has not shown that any of the speakers prevented her from succeeding in the workplace or interfered with her opportunity to do so.  *Pfeil*, 90 F. Supp.2d at 750.

As the Supreme Court observed,

> We have never held that workplace harassment is automatically discrimination because of sex merely because the words used have sexual content or connotations. We have never held that workplace harassment is automatically discrimination because of sex merely because the words used have sexual content or connotations. . . . "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview. . . . We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace-such as male-on-male horseplay or intersexual flirtation-for discriminatory "conditions of employment."

-39-

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. at 80, 81, *citing Harris v. Forklift*, 510 U.S. at 25, 21.  *See also Young v. Houston Lighting & Power Co.*, 11 F. Supp.2d at 933 ("For Title VII to step in, the Plaintiff must do more than conclusorily allege that men made dirty jokes about women, did not like working with her, and that her uniforms did not fit.").

    As for Plaintiff's retaliation claims under the federal and Texas statutes, while Plaintiff's purported complaints to management about sexual harassment may satisfy the requirement of opposing a practice made unlawful by Title VII and the TCHRA with a "reasonable belief that [TPS] was engaging in unlawful employment practices"[21] and Plaintiff's termination was clearly materially adverse to Plaintiff, Plaintiff fails to provide any evidence of a causal connection between her protected opposition and her discharge other than their close proximity in time.  Instead she proffers only her subjective belief that the were causally related, clearly not competent summary judgment evidence.  As noted, since TPS has articulated a legitimate, nondiscriminatory reason for her termination, Plaintiff must do more than assert the close proximity in time between her complaints of sexual harassment by fellow employees and her termination; she must "offer some evidence from which the jury may infer that retaliation was the real motive."

---

    [21] *Turner*, 476 F.3d at 348 *citing Byers v. Dallas Morning News*, 209 F.3d 419, 428 (5th Cir. 2000).

*McCoy v. City of Shreveport*, ____ F.3d ____, No. 06-30453, 2007 WL 1991042, *2 (5th Cir. July 11, 2007).   She has not shown that but for her purported complaints to Anthony, Flowers and Snyder, the adverse employment action would not have occurred.   *Strong v. University Healthcare System, LLC*, 482 F.3d at 806, *citing Septimus*, 399 F.3d 608. *See McCoy*, 2007 WL 19991942, *7, affirming the dismissal of plaintiff's retaliation claim on summary judgment, the Fifth Circuit concluded that "McCoy's attempt to prove pretext simply by showing that the [defendant's] decisionmakers knew of her complaints and took an adverse action shortly thereafter fails. She offers no evidence from which a reasonable juror could infer that the legitimate reason proffered by the [defendant] . . . were pretextual.").   Nor has Plaintiff produced substantial evidence demonstrating that TPS's articulated reasons for her dismissal were pretextual.

Accordingly, for the reasons indicated above, the Court ORDERS that Defendant TPS's motion for summary judgment (#12) is GRANTED.

SIGNED at Houston, Texas, this 29th day of August, 2007.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

-41-